Good morning, and may it please the Court. I'm Margaret Shia for the Petitioners. I've reserved five minutes for rebuttal. Streptomycin is a critically important antibiotic that is used to treat diseases in people like tuberculosis, plague, and infections of the human heart and urinary tract. This case concerns EPA's decision to allow unprecedented amounts of streptomycin to be sprayed on citrus plants as a pesticide. While the diseases affecting citrus are no doubt severe, this does not justify greenlighting streptomycin's new crucial information about both the risks and the benefits. Here, the agency violated FFRA, the federal law regulating pesticides, for four reasons. First, EPA ignored the serious risk that antibiotic resistance would spread off-field to human pathogens through environmental pathways. Second, the agency also assumed, contrary to both law and the record, that label instructions requiring use of Personal Protective Equipment, or PPE, would adequately protect farmworkers from antibiotic-resistant infections. Third, EPA lacked sufficient data to understand the registration's risks to pollinators, whose populations have been in And fourth, EPA disregarded the dearth of data showing that streptomycin even works for its approved uses. In addition to these multiple violations of FFRA, EPA has conceded to a significant violation of the Endangered Species Act. Vacater is warranted here. I'm happy to answer the Court's questions about any of Petitioner's arguments, but otherwise I'll plan to focus on antibiotic resistance and Vacater. Antibiotic resistance causes tens of thousands of deaths and billions of dollars in health care expenses every year in the U.S. It occurs through natural selection. Every time an antibiotic is used, only those bacteria with the genes to resist will survive and multiply. In addition, we know that bacteria can transfer their resistance genes to other bacteria that they come into contact with. Counsel, we recognize that. It would be helpful to me if we could focus on the specific arguments that you've made under the statute. So under FFRA, you say that the agency did not give adequate consideration of the risk to humans through environmental pathways. What was deficient about the study on that issue? Your Honor, the agency failed to look at how environmental pathways would allow antibiotic resistance to spread off-field. And by that, I mean beyond the four corners of the citrus grove. The agency recognizes in other parts of the record that both streptomycin itself and streptomycin-resistant bacteria, or bacteria in general, are mobile. They move. It's not as though there is some sort of impermeable wall around citrus groves that prevents chemical substances or bacteria from moving off-field. We know from the record that there is a risk that streptomycin itself will travel off-field. For example, it will drift into surrounding communities. It can get into sources of drinking water. We also know that bacteria themselves can move off-field. They can be carried by the wind. They can get into water. They can be in soil and dust. They can be carried by living organisms or people moving in and off-field. Yet, the EPA never considered the risk that when either streptomycin or streptomycin-resistant bacteria are carried off-field, that they will come into contact with human bacteria and cause resistance to develop in those bacteria. Counsel, so it appears that the agency relied on the risk assessment framework that evaluates food products. And so, why wasn't that adequate to assess the environmental pathways concern that you have? Sure. Your Honor, that's because food is a very narrow pathway. It's one way in which antibacterial, antibiotic-resistant bacteria can get to humans. But there are other ways. Again, as I mentioned, streptomycin itself can be carried off-field through the environment, through air, through water, through soil. And when it comes into contact with human pathogens on people's bodies, on people's clothing, just in the environment generally, this can cause resistance to develop, regardless of whether— Under our review, can we second-guess the method by which the agency elected to assess this issue? Do we get to do that? Your Honor, the court defers to reasoned analysis. It doesn't defer to just unexplained, conclusory choices. And that's the case here. Here, EPA used the FDA Guidance 152 Framework, which was adapted from a very different context. In the context of animal agriculture, antibiotics are administered via injection or by oral feeding to animals. And this results in a lot less exposure into the environment. In contrast, here we have application of the antibiotic by air blast. That's the method of pesticide application that leads to the second-most exposure after aerial spraying. EPA claims that it looks at the risk that this will lead to the spread of bacteria off-field versus environmental pathways. But I'd invite the court to look at the one-page exposure assessment that EPA conducted. That's on page 3ER290. And on that page, EPA homes in on two sentences in the first paragraph. In those two sentences, EPA recognizes that the plant agricultural use will lead to greater environmental exposure, but then it dismisses the risks associated with that exposure. The agency asserts that this may have less impact on resistance in human pathogens because, quote, human pathogens are a relatively minor component of the general agricultural environment, end quote. This is the gist of EPA's purported analysis of the off-field spread of antibiotic resistance via environmental pathways. And it's deficient for two reasons. First, although EPA is talking about antibiotic resistance, it is narrowly focused on the general agriculture environment. In other words, it's focused on what's happening within the citrus grove. There's no evidence that the agency did anything to look at the risks that result when either through those various environmental... What about the mitigation measures, though? And I'm not talking about the PPE, but there are various measures about how to spray it and things of that nature that seem to reflect awareness of this issue. Your Honor, there are various mitigation measures, and they were imposed in part to address risks to toxicity. But the issue here is not that mitigation... Mitigation is not necessarily sufficient. The question is how much risk remains after mitigation. The risk that remains after mitigation must be reasonable. And the problem here is that the risk is fundamentally unknown because EPA did not look at this important area of risk. And so when you mitigate an unknown risk, the remaining risk is still unknown, and that is what violates FFRA. EPA's bare assertion in its exposure assessment that human pathogens are a relatively minor component of the agricultural environment, that's also contradicted by the agency's repeated statements elsewhere in the record that it doesn't actually know how common human pathogens are in the environment. For example, on 2ER-182 and 2ER-184, the agency asserts three times that, quote, there is little evidence for or against the presence of microbes of human health concern in the plant agricultural environment. EPA never tries to reconcile these conflicting statements. In addition to overlooking the risks associated with the off-field movement of antibiotic resistance via environmental pathways, the agency also unlawfully dismissed the risk to farmworkers, the risk that they would develop antibiotic-resistant infections. And here, EPA assumed that there would be perfect compliance with label instructions requiring the use of PPE. This is contrary to the law and to the facts. FFRA required EPA to consider the use of streptomycin in accordance with widespread and commonly the substantial noncompliance among farmworkers, often for reasons beyond their control, with PPE label requirements when handling pesticides. EPA's refusal to consider that evidence directly violated FFRA. In addition, even assuming perfect PPE compliance, EPA doesn't address the situation when farmworkers aren't required to wear PPE but are nonetheless going to be exposed. For example, this can happen when farmworkers are in their communities and they're exposed to spray drift and they breathe in streptomycin. This can also occur when they re-enter treated fields 12 hours after spraying. We know from the record that streptomycin persists in the environment. We know that farmworkers aren't required to wear PPE 12 hours after spraying. And so this was an exposure that EPA needed to look at, and it failed to do so here. Can I ask you about the remedy, the vacator versus the remand? You know, we have a recent case that came out just a month ago, a similar case with a FFRA violation and an Endangered Species Act violation. And here we have the Endangered Species Act issue, which is undisputed. We can assume, just for purposes of this discussion, that maybe there's some FFRA problem in here too. Even then, under Center for Food Safety versus Regan, why do you think this case would merit a vacator when that case ended in a remand with a 180-day compliance period? This case is very different on the facts, Your Honor. In that case, the court emphasized the unique nature of the facts in that case. The court recognized that there was a strong case for a vacator, but one thing that it focused on was the alternatives. In that court, the court recognized that vacator would actually result in greater environmental harm because there was evidence in the record that the alternatives to the pesticide at issue there, the alternatives that growers return to if the registration were vacated, those are actually more toxic than the pesticide at issue. And so taking that pesticide off the market would actually result in greater environmental harm. That's true. That specific rationale doesn't work here, but I think there are some other differences here where we have, for example, streptomycin, which has been used, I think, for decades in different types of products. I don't see arguments that it has toxicity. I think there's allegations of that, but I'm not sure I've seen evidence of that. We also have a fairly significant citrus disease problem that's very well known and affects a huge industry and presumably a food supply. And so in weighing these balance, why wouldn't it be more appropriate in this case to remand rather than to vacate? It wouldn't be appropriate. And to address the two points Your Honor used, even though we have evidence that it's toxic or that it's contributed directly to human antibiotic resistance, is not very probative for several reasons. First, as EPA has recognized, the increased use here will lead to increased risk for antibiotic resistance. The registration authorizes a really large and unprecedented amount of antibiotic use here. To put things into perspective, it increases the use by 18 times. That means that in the next four years, the remaining four years of the registration, more streptomycin will be sprayed than has been sprayed in the first 65 or so years that the pesticide has been registered. Second, there has never been, to Petitioner's knowledge, any requirement that there be monitoring for the development of antibiotic resistance in people. Even for this registration, the only monitoring that EPA has required is for the development of antibiotic resistance in plant pathogens. And as a practical matter, it's not even clear how that monitoring would happen. It's not clear that growers would have the equipment, the technical training, or the resources to monitor for the development of antibiotic resistance in humans. As for the diseases in citrus, those are serious. There's no doubt of that. But here, there's a problem where there's not substantial evidence that streptomycin even works for the uses that it's been approved for. As one example, EPA approved streptomycin for uses to both prevent and treat disease. But the agency has conceded outright that there's no evidence whatsoever that streptomycin is effective for preventing disease. And as for treatment, there's no substantial evidence there either. As one example, for the proposition that streptomycin is effective for treating citrus canker disease, there was one study in the record submitted by the applicant. But that study was flawed as a matter of basic science. That study looked at a treatment that involved both streptomycin and copper. However, as we already know, copper is an effective treatment for citrus canker disease. The study did not include any control group looking at just streptomycin by itself or copper by itself. And then in the absence of that comparison, there's no way to rashly attribute the observed treatment benefits to streptomycin. And so to say that there will be disruptive consequences, that's just not persuasive when there's no substantial evidence that streptomycin even works. And so this is another key reason why our situation is different from the situation in CFS versus Regan. And here, I'd like to emphasize that the harms here are very, very real and very serious. The CDC has recognized and called this situation relating to antibiotic resistance a crisis. It says that every year, about 35,000 Americans die from antibiotic-resistant infections. That's about one person every 15 minutes. Right. That's a high-level point, though. I mean, what is the evidence that this will actually lead to unreasonable risk of harm to humans or otherwise for this particular pesticide in this particular application? Yeah. We know several things here. We know a lot about the fundamental mechanics of antibiotic resistance, and we know about how this pesticide has been approved for use. So one thing that's well established is that the more antibiotics are used, the more resistance is likely to develop in bacterial populations. We also know that this is the largest approval ever of streptomycin. As I mentioned earlier, it increases the uses by 18 times. We also know that bacteria themselves and also streptomycin are mobile. They will be carried off-field and to places where people are. Farm workers will be exposed to streptomycin. And we also know here that bacteria can easily transfer resistance to other bacteria. So if you have a bacteria, whether it's a human pathogen, whether it's a plant pathogen, whether it's some sort of other environmental bacteria, if that bacterium has developed resistance and it moves off-field, comes into contact with a human pathogen, there is a risk there that resistance will transfer. We all know, we know these basic things about how antibiotic resistance works. We know that previous agricultural uses of streptomycin in plants has resulted in resistance, at least in plant pathogens. And so that risk is very real. And at a minimum here, EPA had to look at that risk and assess it. Councilman, may I ask you a question about vacator? In the Regan case, we said that we would not vacate because it may end up harming the environment more and disrupting the agricultural industry. Is that true in this case? No, Your Honor. As I mentioned earlier in response to a question by Judge Bress, the there's no evidence here that there are more toxic alternatives out there that growers would resort to. EPA has not even attempted to argue that taking streptomycin off the And it is the agency's burden if, to justify, departure from the presumptive remedy of vacator. In addition, as regards to disruptive disruption, that again is premised on the notion that streptomycin actually works. And as I've discussed, there's not substantial evidence that streptomycin is effective for any of its uses, either for treating or preventing citrus canker or citrus reading diseases. Counsel, you have very little time for rebuttal. Do you want to save the little time you have? Yes, Your Honor. Thank you. Thank you. We'll hear from the government. Good morning, and may it please the Court. My name is Dan Durkee from the U.S. Department of Justice, and with me at council table is Jory Diacon from U.S. EPA's Office of General Your Honor, I'd like to address the, I guess, five points that counsel raised. The first four were about the merits, and the fifth about the remedy. The first point is, did EPA ignore resistance through environmental pathways? The record supports EPA's conclusion that these new uses will not cause unreasonable adverse effects on the environment. And that not only looked at the benefits, but also the risks, and specifically the risks of environmental pathways. Counsel pointed to the record, page 290, and that's exactly where EPA made its explanation. That's where EPA did the exposure, the assessment of how to take the FDA guidance, apply it in this context, and what the result was. The counsel, in their framework, it's basically a three-part framework that EPA applied here. The framework is, look at the release, look at the exposure, and look at the consequences. And that's exactly what EPA did here in the context of an agricultural use. And that's explained at excerpt of the record 290, and some of the things that counsel quoted, where EPA did look at things like streptomycin being carried off-site. EPA looked at the difference between animal use and the general agricultural environment where streptomycin is used now. So the record does show that EPA looked at the question of resistance spread through environmental pathways, and the record supports EPA's decision on that. The second point that counsel raised is personal protective equipment, and there's two aspects to that issue. One is evidence of noncompliance, and one is even if people do comply with the requirements, will it work? The evidence of noncompliance, the information that petitioners put in front of the agency during the rulemaking was basically generic studies. They point to the National Family Farm case where this court came to a different conclusion, but that was a very different case where the opinion in National Family Farm Coalition talked about how extremely complex the label was in that case. There was actual evidence of noncompliance with it. There was testimony that even sophisticated users didn't really understand it. Here they have generic information about studies that don't have anything to do with more straightforward labels, with labels of this nature. And so we think that the petitioners didn't really put in front of the agency anything to contradict the agency's basic position is that the label is the law. Under FIFRA, the label is the law. If the label says you have to use certain PPE, then users are supposed to do that, and it was reasonable for EPA to assume that users would actually comply with the label instead of not comply, absent more specific evidence. The point about whether even if they comply, would that be sufficient, we argued in the brief that that was waived, that nobody put in front of the agency the specific point that petitioners are trying to argue in their brief in here, which is that EPA imposed a 12-hour reentry interval, that after it's people are going to be exposed after 12 hours. Nobody said in their comments that the 12-hour reentry period was unreasonable. And so the arguments that flow from that we think are waived because there is no explanation in the record for that because nobody put that in front of EPA. Let's talk about the pollinators. I assume you're about to get to that anyway. Yes. So for pollinators, EPA said the data is complete for this particular use and acted accordingly. EPA made that decision based on its guidance, which we put in the supplemental excerpts of record. That gives a flow chart. It's at page 155 of the supplemental excerpts about how EPA should make decisions based on a new use and the amount of data available. So EPA did not conclude that there was incomplete data and approved the registration anyway. EPA concluded that there was sufficient data to analyze the effects on pollinators, that it's non-toxic to pollinators, and that if more data was needed, it could be called in under the separate registration review process that doesn't look narrowly at just this particular use, but looks more broadly at all uses of streptomycin. This is an area in your brief acknowledges the decision is, I think you say, admittedly unclear. That's probably fair. On the one hand, it says it's complete, and there's other parts of this same section that say it's incomplete. How do you reconcile these things? It's complete for the purpose that EPA had in front of it when it made the decision, which is can it approve the amended registration for these particular uses? Whether it was complete or not for the broader purpose of registration review, that was unanswered. That EPA is still looking at because it's still in the process of registration review. So what was unclear in the record, admittedly, is the purposes for which EPA was talking. The statements, I'm not going to say the statements are taken out of context because the context wasn't made clear in the record, but that is the context that EPA was looking at, two different distinct purposes. Yeah, I mean, that's not so obvious from the face of the decision. Again, we concede that EPA could have been clearer on that, but that is, EPA does talk in the decision document about the need for, and I think we talk about this in our brief, about where you can see in the record where EPA talks about the registration review context, which, again, is different from what EPA had in front of it. Even if that is true, what is the, is there an explanation in this decision as to why, if we're still looking for, we're going to be looking at additional data in the context of registration review, why it wouldn't be appropriate to look at that data now? I don't think EPA explained that in the record, but EPA felt that because EPA concluded that the data was sufficient for this, the amended use that was before it, then it could make the decision about unreasonable risks. The fact that on a broader review it might need more data isn't necessarily a reason to hold up each particular use that's been before the agency. What are the differences between these two types of reviews? The registration review looks at all uses. It's a much broader field. If EPA decides that streptomycin in any of its uses, if there's problems, for instance, mitigation measures, in this context of a particular amended registration, EPA can only impose mitigation measures for that particular product and that particular use. In registration review, if EPA makes a similar decision that mitigation measures are appropriate, it can impose them across the board for all uses because all uses are in front of the agency. Another difference is that on a regular basis, EPA has to conduct registration reviews, so these come up every time as opposed to a particular use, which in this case is time limited, so it's going to either expire or the registrant could come in and ask for it to be extended. I confess I found this part of the EPA's reasoning somewhat more difficult to follow. Your brief, I think, clarified it to some extent, but the explanation in the brief is not, that's not in the decision. Your Honor, petitioners in their brief do say that this is ad hoc. I'd say it's not an ad hoc, you know, post hoc counsel's explanation. I would say that what I'm doing is guiding the court to understand the disparate references in the record. I'm not putting anything before the court that's not in the record. I'm connecting the dots, and I think that's a legitimate thing for counsel to do, as opposed to giving the court an answer that the agency didn't articulate in any way. Again, it's admittedly not clear, could have been clearer, but I think the essential elements are there. Can I ask you about the benefits? The petitioners have a few arguments here. The one that I wanted to ask you about was the reference in the decision to prevent, you know, the use of the word prevent, and I just can't tell whether that's meant in the sense that it could prevent disease or more means to prevent the further spread of the disease. I just couldn't tell, and I'm not sure I'm satisfied by the argument that we can deal with this later as a back-end labeling issue if somebody tries to do that. I'm not sure you put forward authority that would support that, but at the same time I'm not sure what exactly was meant by this in the first place. Your Honor, EPA sees that as an issue of the pesticide's efficacy, not an issue of whether the pesticide poses unreasonable risks for the environment. So, granted, prevention was not in the registrants in the information presented to the agency to prevent disease as opposed to treat it. That was not in there, but that distinction didn't really have anything to do with EPA's analysis under FFRA of whether it had unreasonable effects. Whether it can prevent as opposed to merely treat goes to its efficacy when used and perhaps its benefits. It does have the additional benefit of preventing as opposed to treating. So, because EPA didn't have the information in front of it about prevention, our argument is that that does not undermine in any way its approval of the amended registration. The analysis of whether there's unreasonable effects of this particular product in the environment is still sound. What it does call into question is whether the pesticide should be used, whether the label should allow it to be used in that way, because it might or might not be effective for prevention as opposed to treatment. And that's why- But when would that decision be made as to what the label would allow? That's something that EPA, as we said in the brief, that's something that EPA needs to take a look at and why the labeling requirements are the relevant path, because EPA might need to amend the label requirements to not allow it to be used as prevention. Would that be done before the streptomycin was actually used in this way for plants? No, Your Honor, because the streptomycin is being used now. Well, so that doesn't- Well, the prevention issue then will not be addressed. If it's already being used and the prevention issue was not addressed, what recourse do the petitioners have regarding that then? Well, Your Honor, it is already allowed to be used in that manner, but our argument is that that doesn't affect the validity of the registration because that doesn't undermine any of EPA's conclusions that the FFRA standard for registration is met. That's kind of a circular argument to me, that you say it's okay to use. Because you said it was okay to use, then you disregard whether or not the benefits were thoroughly assessed. Well, the record, there's really not much in the record about this, but one thing that is in the record is that EPA assumed that streptomycin would basically be used on all citrus acres. There wasn't specific information about how widely it would be used, but EPA's analysis assumed that it would basically be used on all citrus acres. Right. So even though the record doesn't explicate this point, I think there's an open question as to whether there's any difference. If EPA's analysis assumed it's going to be used on all acres anyway. But the question is whether or not the benefits were adequately studied and assessed. Yes, Your Honor. And on that point, EPA's decision document, I think, is clear that it did not rely on prevention as a benefit. Granted, the label does allow the use of prevention, but the decision is not based on that. It's based on control of the disease? It's based on, yes, controlling the effects. As counsel said, EPA did not conclude that it can cure. Nothing known can cure the disease. So the benefits are not based on cure and not based on prevention. It's based on ameliorating the effects. And was the assessment based on the use of streptomycin alone or with copper? The one study that petitioners referred to does look at the use of streptomycin along with copper. What was the agency's approach? Your analysis, was it based on the use of streptomycin alone or with copper? I believe EPA relied on that study that was presented. Where can we go on the record to confirm whether or not the EPA was looking at the benefits of streptomycin alone or when added to copper? Where is that in the record? Let's see. The decision document is in the excerpts of the record starting at 33. And the benefits are at 46. Forty-six. And so can you point me to where it talks about whether we're talking about alone or in combination with copper? Where is that? Well, on that point, I think EPA is assuming that it's going to be used with copper. Well, but it's difficult if the study doesn't – if your decision document doesn't tell us what the premise is for the review and the approval and the registration, it's difficult for us – well, I won't say us. It's difficult for me to determine whether or not your process was adequate because I don't know if you're talking about streptomycin alone or streptomycin with copper, in which if it's with copper, there's a question as to whether you even need the streptomycin. And if it's alone, there's a question of whether or not there's a benefit. So to me, this document is incomplete in that regard. Well, just looking at the effects with copper, EPA – the study only looked at it with copper, and EPA said that that was sufficient because that's how it's going to be used. Okay, so if we're in the decision document, does it say that? That – let me find that for you. And as I'm looking for that, the other point that I was trying to answer that I think was not responsive to your question, but the other point I was trying to answer was in the decision document, EPA also said that it was looking at the benefits of ameliorating the effects. EPA didn't claim to be looking at the benefits of either prevention. Right, I understood that. Okay. But I want to know what your starting basis for the registration was. Was it streptomycin alone or streptomycin with copper? That makes a huge difference to me. Right. So let me see if I can get – let me quickly see if I can find where in the record EPA says that. Okay. So the second point is on page 47, the paragraph that starts, EPA has concluded streptomycin benefits citrus growers, and that is where – Are we to presume that you are referring to streptomycin alone and not in combination with copper? Because it doesn't say streptomycin in combination with copper. It just says streptomycin. Right. It says that streptomycin has a different mode of action than copper. Where does it say that? Around the middle of the paragraph, it says streptomycin likely play a role in resistance management because it provides a different mode of action than the registered alternatives, which are primarily copper products. But that doesn't answer the question as to whether or not your analysis is for streptomycin alone or for streptomycin with copper. You talk about streptomycin, then you talk about treatment of citrus trees with streptomycin plus copper. Right. Reducing the incidence, but you don't come to a conclusion to me that streptomycin alone has that benefit or if it has to be paired with copper. That's not clear to me. Well, I think that next sentence is the agency's decision that it's not streptomycin alone, it's streptomycin plus copper. What sentence says that? The sentence that starts treatment of citrus trees with streptomycin plus copper. So EPA is looking at streptomycin used with copper, and then it continues reduced incidence of citrus canker and tree defoliation, premature fruit drop, and increased fruit yield. That's where EPA says it's not going to cure the disease. Right, I get that point. That's not the point. The point is why can't you just use copper then? Why do you have to have the combination of streptomycin and copper? To me, it isn't clear why the streptomycin has to be added if copper is already doing that. That explanation to me isn't laid out. There's two reasons, and let me give you the reasons and then see if I can point you to the record where they're set out. I'm pretty sure it's in our brief, but I'll try and find them and give you the specific page size. Well, the brief isn't the agency's decision. We have to look at the agency's decision. No, I understand. I think in the brief I cite the right page of the record. Let me give you the reason is that copper has negative effects itself. It's phytotoxic. So copper alone has adverse effects on the fruit. If the streptomycin is used, you can dial down the amount of copper that's used. Exactly. It would be helpful if it said that in the decision. Let me see if I can point you to the page where it says that. But by dialing down the use of the copper, there's two benefits. One is less copper in the environment, and two is less of the negative effect that copper has. I won't use your time doing that. It's not a waste of time, but you're running out of time. The final question I had is where did you discuss the Zhang study criticizing the use of streptomycin? Where did you address that in the decision? In the decision? Let me find that page to you. It was, I believe, on 176. That is excerpt of record 176. Let me get there. Let me just make sure that's where it is. Yeah. It's the paragraph that starts bead response, the cited reference Zhang et al. That's the page. That's where EPA acknowledged the Zhang study. I thought that in the brief you said that it was in a lab and not in the field and focused on curing rather than maintenance. But I don't see that here. I wanted to see where that was in the actual decision. That, I believe, is not in the decision, but the Zhang study itself, which is in the record, says that it was conducted under lab conditions. The problem I have with this argument is that the petitioner said that the study ignored the Zhang study. And the decision doesn't, it just mentions the study but doesn't say why the study was not grappled with. In the brief you do that, but the decision doesn't do that. That's the difficulty I'm having. I understand. The decision, I think, clearly shows that EPA did not ignore the Zhang study. The particulars of the Zhang study are not spelled out in this portion of the record but are in the Zhang study itself. I know you're out of time, but if I may ask about the remedy. Because of the, at the very least, the Endangered Species Act issue, some further work has to be done. And, of course, the Center for Food Safety was fairly critical of the EPA for not abiding by its Endangered Species Act obligations. It seems to be a fairly chronic issue. But I guess my question is, in that case, they gave you 180 days. Would that be appropriate here? Your Honor, I do not think it would be appropriate. I think it would not be appropriate. We put in the record, the EPA has declarations in the record explaining its path forward and how much time it will take. And EPA expects that, under the best-case scenario, the soonest it can get the data that it needs from the applicant and make the required determination is not before the fall of 2026. Yeah, I saw that. I mean, that's sort of hard to hear when we have another case that orders 180 days and we're, in that case, EPA seemingly able to move more expeditiously. I mean, it's not us setting these obligations. This is by Congress. And you're talking about 2026. This only had a seven-year approval period, so you're already going to be getting to the tail end of that by the time you complete that review. EPA understands that, and that's why EPA provided the Court such a detailed affidavit declaration explaining why that date is not just pulled out of the air, how EPA got to that date, that it takes time to do studies, that EPA feels that it can't make the decision on effects that's required by DSA without those studies. Well, this petition for review actually was filed here almost two years ago. Yes. So what work has been done in the last two years on this issue? EPA has developed what's called a data call-in, a request to the applicant to do the studies that EPA needs to make the DSA determination. That itself is a lengthy process because there are statutes that govern when EPA can ask for information. EPA needs to go through certain steps within the government to ask for information. Most importantly, EPA can't just say, give us more information. EPA had to figure out what studies it needed, what conditions those studies should be under, and put it together in a responsible way to ask the applicants. But why wasn't this done in the first instance? The agency knew of its obligation, so why wasn't it done originally? EPA does know of its obligations, yes, Your Honor. The reason, and it's not in the record why EPA didn't do it initially, except that EPA felt that the FIFRA analysis was sufficient. It couldn't have believed it was sufficient when there's a legal obligation to also do the ESA analysis. Just looking at the standard of whether there's unreasonable effects to the environment, which is a broader analysis than the ESA analysis. Both do have to be done, but the FIFRA analysis, as I think this Court's recognized in earlier cases like Washington Toxics, is a broader, different kind of analysis. But it doesn't focus on the endangered species, which is the charge under that act. And so, oh, I'm sorry, Judge Gould. If I can interject one question here. You're the presiding judge, you can give yourself permission. Okay, I give myself permission. Then for the EPA, if the EPA is going to be studying some of these issues that have been raised and will be revising its decision, is there any harm to the EPA or to the public if we vacate the decision now pending the next round for the EPA? Well, Your Honor, I don't think there's harm to EPA. The harm to the environment would be what we were talking about earlier, that taking streptomycin away as a tool will essentially require citrus growers to rely on the other two tools that they have before them, both of which have downsides. One is copper, and I can give the Court the site finally. Excerpts of Record 299 is where EPA explains that copper causes blemishes, basically phytotoxic reactions, blemishes on the fruit, so that there's a downside to using copper. And the other downside is that the other product, oxytetracycline, if there's only one antibiotic on the market for citrus growers to use, then plant pathogens could develop resistance to that more easily than if farmers can alternate between two different ones. That's not a danger to the environment, that's a danger to the industry, but not to the environment. Well, the danger to the environment would be that plant pathogens would develop resistance to oxytetracycline because it's the only thing that farmers could use. But on the other hand, if this is approved and there is a danger to endangered species, it would be endangering them for the entire period during which you were doing the study, which you're telling us is upwards of three years. Yes, Your Honor, the soonest that EPA feels like it could make a decision on whether there are effects or not is the fall of 2026, and that's if everything goes right, that they get the data they're going to ask for and the data is in a usable form. But the unknown is whether EPA finds effects or not. But that's the problem. If effects are found, then we would have exposed endangered species to those harmful effects for a period of upwards of three years. And so looking at whether or not the industry can continue to use copper and the other antibiotic versus injury to endangered species, which are the target of this statute, do you think the vacator is more indicated in those circumstances? Well, Your Honor, again, I go back to it is a balancing test. It's an equitable test whether or not to vacate. And EPA feels that the balance of the equities favor allowing the product to continue to be used. For that extended period of time? Yes, Your Honor. If, to go back to Judge Preston's earlier question about a deadline, if the registrations were allowed to stay in place but under a relatively short or shorter time period, EPA knows that it can't act faster than fall of 2026. That's why EPA put the declaration in. It feels like there's no realistic possibility for the studies to be done more quickly than that and for EPA to act more quickly than that. So if the court were inclined to remand without vacature but on a shorter time frame, like 180 days like was in the food safety case, that would change the analysis. And in that case, I would say vacature is the preferred remedy because it doesn't make sense from EPA's perspective to exceed to a court order to do something the EPA is telling the court it cannot do. So the preferred remedy from EPA's perspective is still remand without vacature, no deadline. But if the court is inclined to impose a deadline that's sooner than EPA said it feels like it could act, vacature would be the better result. I appreciate your candor. Thank you, Your Honor. All right, rebuttal. Your Honor, counsel has said that if the court is going to impose a short deadline that EPA can't make, then vacature is a better option. And here EPA has represented that fall 2026 is the very earliest that the agency would be able to complete the effects determinations. That's not taking into account any delays that might happen. That's also not taking into account what would happen if EPA finds that streptomycin may affect any species. Then the agency will have to consult for any species or any critical habitats which may be affected by streptomycin. That will take further time. And this timeline is also not taking into consideration any of the time the agency will need to complete its FFRA analysis on remand. And here it's not a situation where the agency can simply offer some additional explanations. There is significant data that's missing from the record on antibiotic resistance, on risk to workers, on pollinators, on endangered species that the agency has to look at. That's going to take additional time. And here, given that unlikelihood that anything can be done quickly, vacature is warranted here to protect human health and species in the meantime. I'd also like to address a few of the other points that Council raised. Going to benefits. On the prevention issue, the issue is straightforward to petitioners. If the agency has approved streptomycin for preventative use, then there needs to be evidence that that actually works. It's on the label. It's allowed. There's no evidence that it works. As for streptomycin's efficacy to treat citrus canker disease, streptomycin is approved to be used on its own. If you look at 1ER6, that's the label, it just mentions one active ingredient. There's no mention of copper within the label. Streptomycin can be used on its own. It could be used with copper. That's not required. But at the end of the day, there's not evidence that streptomycin actually works. If your Honor looks at 3ER300, that's the benefits analysis that was conducted, and it makes very clear that the study was looking at streptomycin with copper, and there was no control group looking at the effects of copper alone or streptomycin alone. In addition, regarding pollinators, EPA has approved an unconditional registration here, and that's distinct from a conditional registration, which is a different type of registration that under certain circumstances, if certain requirements are met, may allow the agency to defer the collection of missing data until registration review. But that's not the type of registration that EPA chose to grant. Here, the agency chose to grant an unconditional registration, which requires sufficient data to analyze risks before making the registration and not after. EPA failed to meet that requirement. Regarding the risks to farmworkers from PPUs here, EPA claims now that the evidence that petitioners provided were too general. This is a post hoc argument. Nowhere in the record when the agency was responding to that evidence did EPA say, no, sorry, this data is too general, we need more evidence. Rather, the agency simply put, we only look at what's on the label, we only look at what's required, we don't look essentially at the real world evidence. And as for the risks to farmworkers when they are not required to wear PPE, EPA claims that we waive that argument. However, the question here is whether the agency was on adequate notice that this is something that it needed to analyze. And the record indicates that the agency was absolutely on notice that this is something, a risk that could occur. We know from the record that farmworkers can be exposed to streptomycin when they are in their communities, when they are reentering treated fields after 12 hours. And the fact that maybe petitioners could have formulated the argument in a more specific way, that doesn't matter here where the agency was well aware that that risk does exist. Your Honor, in light of the lack of substantial evidence of any benefits for the youth, and on the other hand, given the significant risks to human health and the environment, we would respectfully ask the court to vacate this registration. Thank you, counsel. Judge Gould, I have one quick question for you. If the court were to decide to grant the petition, vacate the decision, and remand, is there any need for the court trying to set deadlines for the agency's next decision, given that it's not going to be able to do that until 2026? Sorry, Judge Gould, did you mean if the court decided to vacate, would there still need to be a timeline? If we were going to grant, vacate, and remand, is there any need for us to try to set deadlines? In our view, if the court decides to vacate the registration in addition to remanding, then there is no need to issue a deadline for the remand. Thank you. All right, thank you, counsel. Thank you to both counsel. The case just argued is submitted for decision by the court. We are in recess until 10 o'clock a.m. tomorrow morning.
judges: GOULD, RAWLINSON, BRESS